UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

JEFFREY R. POWERS, acting in his capacity as the
authorized Sellers' Representative under that certain
Transaction Agreement dated April 23, 2012,

                   Plaintiff/Counterclaim-Defendant,

          -v-

STANLEY BLACK & DECKER, INC.,

              Defendant/Counterclaim-
              Plaintiff/Third Party Plaintiff,

          -v-

JEFFREY R. POWERS, CHRISTOPHER W. POWERS,
and FREDERIC B. POWERS, III, in their individual
capacities,

              Third Party Defendants.

------------------------------------------------------------------------X

14 Civ. 2052 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

     This case involves claims that false representations and warranties made in connection

with a corporate acquisition justified the buying company in refusing to release to the seller

certain funds held in escrow.

     On April 23, 2012, the buyer, Stanley Black & Decker, Inc. ("SB&D") entered into an

agreement (the "Transaction Agreement" or "Agreement") with Jeffrey R. Powers, Christopher

W. Powers, and Frederic B. Powers, III (collectively, the "Powers Parties") to buy, for $225

million, the worldwide business of Powers Fasteners, Inc., including its subsidiaries and affiliates

(the "Powers Business"). The deal closed a few weeks later. The Transaction Agreement

established an escrow account of $16.5 million, as well as a series of dates, over several years,

on which the escrowed funds were to be released to the selling Powers Parties—provided that both sides agreed to release the escrowed funds.  But the Transaction Agreement entitled SB&D to refuse to consent to the release of certain funds if, *inter alia*, the Powers Parties had breached any of their representations or warranties in the Agreement.

Not long after the transaction closed, SB&D notified the Powers Parties that it believed they had breached multiple warranties by misrepresenting a variety of facts in the Agreement, including relating to the Powers Business's financial condition, liabilities, taxes, ongoing litigation, and intellectual property.  On that basis, SB&D declined to consent to the release of more than $4.2 million in escrowed funds.  In response, the Powers Parties brought this suit, claiming that SB&D had breached the Agreement by unjustifiably withholding these funds.  SB&D counterclaimed, asserting that the Powers Parties had breached multiple warranties.[1]

Now pending before the Court are the parties' cross-motions for partial summary judgment.  The issues, at this stage, solely involve whether the Powers Parties made, as to four distinct subject matters, misleading representations in breach of the Transaction Agreement.  The damages arising from any such misrepresentation, if found, would be determined later.

For the reasons that follow, the Court holds that the Powers Parties breached the Agreement by making two misrepresentations.  Specifically, the Powers Parties wrongly failed to disclose to SB&D (1) ongoing litigation involving the imposition of Canadian import duties, and (2) an ongoing patent dispute in Australia.  However, the Court holds that the Powers Parties

---

[1] Jeffrey Powers, as the Seller's Representative, initiated this lawsuit on behalf of the Powers Parties; SB&D counterclaimed against him, and filed a third-party Complaint against him, Christopher W. Powers, and Frederic B. Powers, III, in their individual capacities.  For simplicity, and following the parties' practice, the Court refers to the various Powers individuals collectively as "the Powers Parties."  *See, e.g.*, Dkt. 32, at 1.

properly disclosed a trademark dispute in Venezuela.  As to the fourth and final claim that

SB&D makes—that the Powers Parties made materially false statements regarding the

imposition of Canadian import taxes—the Court denies *both* parties' motions for summary

judgment.  The Court accordingly grants in part, and denies in part, each party's motion for

summary judgment.  The Court also holds that, in light of these rulings, and because the

Agreement permits SB&D to obtain "diminution in value" damages for a breach of warranty,

SB&D has to date lawfully withheld the money in escrow.

## I.       Background

### A.       Factual Background[2]

#### 1.       The Parties

SB&D, a Connecticut corporation, is a manufacturer of industrial tools and household

hardware, as well as a provider of security products and locks.[3]  The corporation resulted from

---

[2] The Court's account of the underlying facts of this case is drawn from the parties' submissions in connection with the pending motions, including: the parties' Joint Stipulation of Facts and Legal Issues to be Resolved on Summary Judgment, Dkt. 32 ("JSOF"); the Declaration of Janice I. Goldberg in support of the Powers Parties' motion for summary judgment, Dkt. 39 ("Goldberg Decl."); the Declarations of Scott B. Markow, Dkt. 43 ("Markow Decl."), Darrin Shaya, Dkt. 44 ("Shaya Decl."), and Jeffrey Hooker, Dkt. 45 ("Hooker Decl."), in support of SB&D's motion for summary judgment.  These submissions, of course, include the Transaction Agreement ("TA") itself and the attached exhibits (financial statements, disclosure schedules, etc.).  *See, e.g.*, Goldberg Decl. Exs. A–F, L.

The parties helpfully submitted only one Rule 56.1 Statement—a joint submission.  Citations to this joint 56.1 Statement incorporate by reference the documents cited therein.  Most of the joint 56.1 Statement consists of undisputed facts; where disputed facts in this 56.1 Statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c), (d).

[3] The parties have not provided much information about their businesses, but the Court may take judicial notice—purely for purposes of background—of the limited facts regarding the nature of the companies as set forth in this paragraph.  *See* Fed. R. Evid. 201 (court may take notice, at "any stage of the proceeding," of any fact "that is not subject to reasonable dispute because" it

the 2010 merger of The Stanley Works and Black & Decker.  Before the transaction at issue here, the Powers Business manufactured anchoring and fastening products for the concrete, masonry, and steel industries.  It was headquartered in New York.

On April 23, 2012 (the "Signing Date"), SB&D and the Powers Parties entered into the Transaction Agreement.  JSOF ¶¶ 1–2.  In it, SB&D agreed to purchase the worldwide Powers Business, including its subsidiaries and affiliates.  *Id.* ¶ 3.  The parties completed the transaction on May 31, 2012 (the "Closing Date").  *Id.*

### 2.    The Transaction Agreement

Later in its analysis, the Court examines several provisions of the Transaction Agreement in detail.  At the outset, however, it is useful to briefly describe three features of the contract—those relating to (1) warranties, (2) indemnification, and (3) the escrow process.

*Warranties*:  In Article III of the Agreement, the Powers Parties made several express representations and warranties.  JSOF ¶ 4.  As detailed below, some concerned the Powers Business's financial condition, liabilities, taxes, ongoing litigation, and intellectual property.  *See generally* Transaction Agreement ("TA"), Art. III.  The Powers Parties represented and warranted that, as of both the Signing Date and the Closing Date, the statements in Article III were true and correct, subject to the exceptions set forth in the disclosure schedules to the Transaction Agreement ("Disclosure Schedules").  JSOF ¶ 4.

---

"can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) ("For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'"); *see generally* www.stanleyblackanddecker.com; http://www.powers.com/about.php (both last visited Sept. 28, 2015).

*Indemnification*:  Under § 9.2(a) of the Transaction Agreement, the Powers Parties agreed to indemnify SB&D for "all Losses incurred by [SB&D] ('Parent Losses') based upon, arising out of, in connection with, or resulting from, directly or indirectly, (i) the inaccuracy or untruth of any of the representations or warranties made by the [Powers Parties] pursuant to any Transaction Document," or the Powers Parties' breach of "any covenant or agreement [they] made . . . in any Transaction Document."  *Id.* ¶ 5.  The Transaction Agreement defines "Losses," in relevant part, as "all demands, claims, actions or causes of action, assessments, losses, damages, costs, expenses, liabilities, judgments, awards, fines, sanctions, penalties," and certain amounts paid in a settlement of a lawsuit.  *Id.* ¶ 7.  "Losses" specifically excludes, as relevant here, "lost profits, consequential damages, [and] punitive damages."  *Id.*  Section 9.1(c) provides, in relevant part, that the parties' knowledge is irrelevant to indemnification:  "The right to indemnification . . . will not be affected by any investigation . . . conducted or any Knowledge acquired at any time, whether before or after the Closing Date, with respect to the accuracy or inaccuracy of, or compliance with, such representation, warranty, covenant, or obligation."  *Id.* ¶ 6.

Section 9.3(a) sets an "Indemnification Threshold" of $25,000, such that SB&D is not entitled to indemnification under § 9.2(a)(i) for any breach of representations and warranties unless SB&D's resulting Losses exceed $25,000.  *Id.* ¶ 8.  In determining whether Losses meet that threshold, "all breaches arising out of a series of related events shall be aggregated."  *Id.*  If Losses "for any breach of the representations and warranties . . . exceeds the Indemnification Threshold . . . , [SB&D] shall be entitled to indemnification for the full amount of all such Parent Losses, subject to Section 9.3(b)."  *Id.*

Section 9.3(b) sets an "Indemnification Deductible" of $1 million, such that SB&D is not entitled to indemnification under § 9.2(a)(i) until the aggregate amount of all Parent Losses

exceeds $1 million.  *Id.* ¶ 9.  If the aggregate amount does indeed exceed $1 million, then SB&D "shall only be entitled to indemnification for the amount of all such Parent Losses in excess of the Indemnification Deductible" of $1 million.  *Id.*

*Escrow*:  The Agreement creates a joint escrow account and procedures relating to escrowed funds.  Specifically, the Agreement created an "Indemnity Holdback," comprised of $16.5 million in a joint Escrow Account, established by the parties in accordance with § 2.6. *Id.* ¶ 11.  Section 2.6(c) states that "the Indemnity Holdback shall be used to satisfy [the Powers Parties'] indemnity obligations, if any, set forth in Article IX and shall be distributed as provided in this Section 2.6(c)."  *Id.* ¶ 12.

In turn, § 2.6(c) establishes a few key dates for present purposes.  It sets May 31, 2013 as the first distribution date.  *Id.* ¶ 13.  On that date, SB&D and the Sellers' Representative (*i.e.*, Jeffrey R. Powers) "shall jointly instruct the Escrow Agent to distribute to Sellers' Representative an amount equal" to $3.75 million *minus* all reductions *minus* "the aggregate of [SB&D's] reasonable estimate of the contingent or non-liquidated Parent Losses that [SB&D] may sustain as a result of any unresolved claims for Parent Losses subject to indemnification under Article IX (individually, a 'Contingent Parent Loss' and, collectively, 'Contingent Parent Losses') then outstanding."  *Id.*  It sets November 30, 2013 as the second distribution date. *Id.* ¶ 14.  On that date, the parties were both, again, to "jointly instruct the Escrow Agent to distribute to Sellers' Representative an amount equal to the excess of the Indemnity Holdback over the sum of (A) $9,000,000, <u>minus</u> (B) the aggregate amount of Reductions, <u>minus</u> (C) the Contingent Parent Losses then outstanding."  *Id.* (emphasis in original).  As reflected in § 2.6(c), however, were the Powers Parties to breach their representations and warranties, so as to result

directly or indirectly in a loss to SB&D, SB&D was entitled to recoup those losses that exceeded $1 million by drawing from the Indemnity Holdback. *Id.* ¶¶ 9–12.

### 3. The Events Underlying SB&D's Holdback of Escrowed Funds

Before May 31, 2013—the first Indemnity Holdback distribution date—SB&D noticed three claims that, it contended, might result in Contingent Parent Losses (*i.e.*, losses to SB&D) subject to indemnification. *Id.* ¶ 15. Based on these three claims, SB&D refused, on both the May and November 2013 distribution dates, to instruct the Escrow Agent to distribute funds to the Powers Parties. SB&D's three claims relate to events in Canada, Australia, and Venezuela.

### a. Canada

The Canadian disputes concern whether the Powers Parties were required to disclose the facts that (1) Canadian border authorities imposed import taxes on the Powers Business's imports of certain fasteners, and (2) the Powers Parties, at the time of the Closing, were in the process of legally challenging those duties within Canada.

In August 2011, acting under Canada's Special Import Measures Act ("SIMA"), the Canadian Border Services Agency ("CBSA") issued Detailed Adjustment Statements ("DASs") to Powers Canada. *Id.* ¶ 25. These concerned Canada's imposition of "anti-dumping duties" on 12 shipments of carbon steel fasteners (hereinafter, the "Products") manufactured in China (or Taiwan) and imported from the United States into Canada in 2010. *Id.* The Canadian anti-dumping duties raised the cost of the Products. *Id.* ¶ 26. Powers Canada paid these anti-dumping duties on the 2010 shipments. *Id.* ¶ 27. These duties amounted to approximately $117,000. *Id.*

Under SIMA, if the CBSA has determined that Canadian anti-dumping duties should be assessed, the importer of the goods may make a written request for a re-determination within 90 days of the CBSA's determination. *Id.* ¶ 28. If that initial appeal is unsuccessful, the importer

may appeal to the Canadian International Trade Tribunal by filing a notice of appeal within 90 days after the re-determination. *Id.*

Powers Canada retained Canadian counsel to appeal the DASs, seeking a determination that the Products were not "subject" goods and seeking reimbursement of the Canadian anti-dumping duties it had paid. *Id.* ¶ 29. On March 14, 2012, the CBSA, rejecting that appeal, issued a determination (the "March 2012 Determination") to Powers Canada. *Id.* ¶ 30. It confirmed that the imported Products were "subject" goods and that the Canadian anti-dumping duties, as reflected in the DASs, had properly been assessed. *Id.* That date (March 14, 2012) fell a little more than a month before the Signing Date (April 23, 2012). Notwithstanding the proximity in time, the Transaction Documents did not disclose the CBSA Determination. As explained below, SB&D argues that this non-disclosure violated a section of the Transaction Agreement that required disclosure of any order or judgment against the Powers Parties.

Nor was the approximately $117,000 import tax disclosed, with specificity, in the Transaction Documents. However, the $117,000 *was* part of a broader $2,689,344 line item that was disclosed, covering Total Operating Expenses for Powers Canada in 2011. *Id.* ¶ 35. (This line item represents the total of marketing expenses; selling, shipping and warehouse expenses; and general and administrative expenses. *Id.*) In addition, the $117,000 of Canadian anti-dumping duties paid by Powers Canada in 2011 was specifically set forth on a *non*-Transaction Document, which—SB&D acknowledges—"certain SB&D employees reviewed" during the due diligence process. *Id.* ¶ 34.

Between January 1, 2012 and March 31, 2012, no DASs concerning the imposition of Canadian anti-dumping duties on carbon steel fasteners were received (or paid) by Powers Canada. *Id.* ¶ 36. Therefore, as of the Closing Date, there were no unpaid, due, or outstanding

DASs received by Powers Canada concerning the imposition of Canadian anti-dumping duties on pre-Closing shipments of carbon steel fasteners. *Id.* ¶ 37.

As to litigation regarding anti-dumping duties, the Powers Parties had 90 days to appeal the CBSA's adverse decision on March 14, 2012. This gave the Powers Parties until mid-June 2012 to appeal that determination. On June 7, 2012—seven days after the Closing Date (May 31, 2012)—Powers Canada filed an appeal to the Canadian International Trade Tribunal (the "CITT"), challenging the CBSA's March 14, 2012 Determination that the imported Products were "subject" goods and that the Canadian anti-dumping duties were properly assessed. *Id.* ¶ 38. This appeal, like the earlier appeal, was initiated by the Powers Parties. *Id.* On April 22, 2013, the CITT dismissed Powers Canada's June 2012 appeal, which resulted in the continued imposition of Canadian anti-dumping duties on Products imported by Powers Canada. *Id.* ¶ 40. As explained further below, SB&D argues that the Powers Parties' non-disclosure of its legal challenges to these duties, culminating in the CITT appeal, violated a provision of the Transaction Agreement requiring the Powers Parties to disclose, *inter alia*, "pending" "litigation" that involved the Powers Parties.

It is undisputed that the Canadian anti-dumping duties are "Taxes," as defined in the Transaction Agreement. *Id.* ¶ 45. The Agreement generally made the Powers Parties responsible for Taxes due during *pre*-Closing periods, and made SB&D responsible for *post*-Closing periods. After the Closing, SB&D, the buyer, was assessed $505,000 in anti-dumping duties associated with *pre*-Closing shipments of Products. However, the Powers Parties later made SB&D whole for these duties, paying out of the Indemnity Holdback. As the Powers Parties explain:

> The parties do not dispute that there were certain Anti-Dumping Duties that were imposed on Pre-Closing shipments of Products but that were not paid until DAS's

> assessing such Duties were received by SB&D from CBSA in 2012 after the
> Closing, resulting in SB&D incurring unpaid Taxes for a Pre-Closing Period.
> However, such Pre-Closing Taxes are the responsibility of the Powers Parties, as
> set forth in Section 7.5(a), and are Indemnified Liabilities as set forth in Section
> 9.2(a)(iv).  SB&D has already been compensated for all Pre-Closing Anti-Dumping
> Duties from the Indemnity Holdback in the amount of $505,000.

Dkt. 40, at 12 n.5.  SB&D agrees, factually, that it was compensated in this fashion.  However, it

contends (as explained further below) that the Powers Parties' non-disclosure of the $505,000 in

pre-Closing anti-dumping duties rendered inaccurate the Powers Parties' representations that the

Powers Business had no undisclosed liabilities and that the Transaction Documents fairly

presented, in all material respects, the business's financial condition.

Finally, after the Closing, SB&D, as the owner and operator of Powers Canada,

continued the Sellers' pre-Closing practice of importing the subject Products to Canada.  *Id.* ¶ 41.

This resulted in SB&D's receipt of DASs, imposing Canadian anti-dumping duties for post-

Closing periods.  *Id.*  The Powers Parties have refused to indemnify SB&D for (1) post-Closing

Canadian anti-dumping duties imposed on the Products, *id.* ¶ 43, and (2) costs that SB&D

alleges it has incurred through mitigation efforts, such as the CBSA "new normal values"

proceedings (with the goal of reducing the amount of anti-dumping duties in the future), *id.* ¶ 44.

### b.    Australia

In letters dated April 27, 2012 and June 15, 2012, Powers Australasia, Powers' Australian

subsidiary, received notice from an Australian law firm of a potential third-party claim of patent

infringement asserted against Powers Australasia by two entities, ITW AFC Pty Ltd. and ITW

Australia Pty, Ltd. (collectively, "ITW").  *Id.* ¶ 67.  ITW's counsel demanded that Powers

Australasia agree to post undertakings or otherwise risk the filing of legal action in Australia

alleging patent infringement by Powers Australasia.  *Id.* ¶ 68.

Despite the fact that the first of these letters predated the Closing Date, ITW's allegations and threats were not disclosed in the Disclosure Schedules. *Id.* ¶ 69. By letter dated June 21, 2012, SB&D gave the Powers Parties timely notice of (a) the fact of ITW's claim, and (b) SB&D's claim for indemnification pursuant to § 9.2(a). *Id.* ¶ 70.

Relevant to this claim, in § 3.12(d) of the Transaction Agreement, the Powers Parties represented and warranted that "[t]he Powers Intellectual Property as currently or formerly owned, licensed, or used . . . , and . . . the Company's conduct of the Powers Business . . . have not, do not and will not infringe, violate or misappropriate the Intellectual Property of any Person. None of the [Powers Parties nor their Companies] has received any communication, and no Legal Proceeding has been instituted, settled or, to the Knowledge of the [Powers Parties], threatened that alleges any such infringement, violation, or misappropriation . . . ." *Id.* ¶ 71.

On July 6, 2012, the Powers Parties replied to SB&D and assumed the defense of the ITW claim. *Id.* ¶ 72. In connection with the defense of that claim, the Powers Parties denied ITW's allegations of infringement. *Id.* ¶ 73. They further stated that the alleged infringing products had been discontinued by Powers Australasia in or about June 2012. *Id.* No further correspondence has been received from ITW. *Id.* ¶ 74. Thus far, ITW has not taken further action to assert claims against Powers Australasia. *Id.*

On May 31, 2013, SB&D wrote the Powers Parties. In stating that indemnifiable losses arising from the Canadian anti-dumping duties claim had left insufficient funds to permit a distribution to the Powers Parties, SB&D also reserved all rights with respect to seeking further amounts in connection with the ITW patent infringement claim. *Id.* ¶ 75. Replying, the Powers Parties requested that SB&D provide a "reasonable estimate" of Contingent Parent Losses, if any, stemming from the ITW patent infringement claim. *Id.* ¶ 76. SB&D did not provide any

11

such estimate, noting that ITW had reserved its rights to take further action and that the statute of limitations on ITW's infringement claim will not expire until June 2018 (six years after the last sale of the allegedly infringing product).  *Id.* ¶ 77.  The Powers Parties challenged the reservation of this claim as improper, claiming that any monetary loss was remote and that SB&D had failed to supply a reasonable estimate.  *Id.* ¶ 78.  At the time of the November 2013 distribution date arrived, both sides reiterated these positions.  *Id.* ¶¶ 79–80.

**c.      Venezuela**

In Venezuela, Anclajes Powers, C.A. ("Anclajes") is the sole authorized distributor of products of the Powers Business.  *Id.* ¶ 83.  In or about 2004, an owner of Anclajes, José Armando Reyes Martinez ("Martinez") sold all his shares in Anclajes and founded a competing distributor, Anchor Fasteners C.A. ("Anchor").  *Id.* ¶ 84.  In 2005, Martinez filed an application (application 2005-010212) with the Venezuelan Trademark Office ("VTO") for the Powers Fasteners Logo.  *Id.* ¶ 85.  Martinez filed the application as a trade name application, but the VTO made a clerical error and registered the mark as a product trademark.  *Id.*

Upon the erroneous trademark registration, Martinez/Anchor instituted a Legal Proceeding against Anclajes for infringement of the newly registered trademark; preliminary injunctions were issued, limiting Anclajes' use of the Powers Fasteners Logo.  *Id.* ¶ 86. However, an appeals court recognized the VTO's error in awarding Martinez the trademark registration and returned the application to the VTO to review as a trade name application.  *Id.* Martinez then filed a nullification action to have the mark re-registered; that action is currently pending before the VTO.  *Id.*

In 2005, Anclajes filed with the VTO trade name application 2005-026152 for the Powers Fasteners Logo.  *Id.* ¶ 87.  This application was denied based on the earlier Martinez application

2005-010212. *Id.* Anclajes appealed this denial; the appeal is currently pending before the VTO. *Id.* In 2008, Anchor filed with the VTO another trademark application, application 2008-001819, for the Powers Fasteners Logo for use on clothing. *Id.* ¶ 88. The Powers Parties filed an objection to this application before the VTO. *Id.*

For its part, in 2006 and 2008, the Powers Business filed with the VTO three trademark applications for the Powers Fasteners Logo—applications 2006-019134, 2006-019133, and 2008-004282. *Id.* ¶ 89. Martinez and Anchor filed oppositions to these three trademark applications. *Id.* The applications and related oppositions are currently pending before the VTO. *Id.*

In the Transaction Documents, the Powers Parties disclosed that they had filed three trademark applications in Venezuela, and disclosed that those applications were all "PENDING." *See* Dkt. 39, Ex. L, at 38. The Powers Parties did not, however, disclose Martinez/Anchor's competing applications or Martinez/Anchor's opposition to Anclajes' applications. *See id.*

Section 3.23(a) of the Transaction Agreement provides, in part, "[e]xcept as described on Schedule 3.23(a), (i) Powers III has good and marketable title to the Transferred Assets, and (ii) each Company has good and marketable title to its assets and properties, in each case free and clear of Liens other than Permitted Liens." JSOF ¶ 90. Based on this provision, on or about September 4, 2012, SB&D noticed a potential claim for indemnification, seeking reimbursement for Contingent Parent Losses potentially arising in connection with these Venezuelan trademark issues. *Id.* ¶ 18. The Powers Parties disputed the Venezuela trademark claim. *Id.* In May 2013, they asked that SB&D provide a "reasonable estimate" of Contingent Parent Losses, if any, stemming from the Venezuela trademark claim. *Id.* ¶ 92. SB&D replied that the costs thus far incurred were approximately $15,000, but that it could incur greater losses in the future, including damages payable to third parties, settlement costs, licensing fees, and diminution in the value of

the Venezuelan business pending an adverse outcome in any or all of the trademark application

proceedings. *Id.* ¶ 93.  In November 2013, SB&D again declined to provide an estimate of losses

stemming from the Venezuela trademark claim, stating there was no reason to do so in light of the

alleged Contingent Parent Losses arising from the Canadian anti-dumping duties claim. *Id.* ¶ 95.

The Powers Parties challenged the reservation of this claim as improper, on the grounds of both

"remoteness" of monetary loss and failure to provide a reasonable estimate. *Id.* ¶ 96.

### d.      SB&D's alleged breach

Contesting the various claims by SB&D of deficient representations and warranties on

their part, the Powers Parties take the position that these representations and warranties were

proper and accurate.  *See, e.g.*, Dkt. 40, at 14, 22.  On this premise, they argue, SB&D breached

the Agreement by refusing, in November 2013, to instruct the Escrow Agent to distribute the

escrowed funds to the Powers Parties.  The Powers Parties maintain that, under the contractual

formula for determining their distributions from the Indemnity Holdback, they were due

$4,205,169.02 on November 30, 2013.  JSOF ¶ 24.

### B.     Procedural History

#### 1.     The Powers Parties' Complaint

On March 24, 2014, the Powers Parties filed a Complaint against SB&D.  Dkt. 2.  The

Powers Parties' Complaint seeks six forms of relief.

*First*, contesting SB&D's claims of deficient representations and warranties as to the

Canadian anti-dumping duties, they seek a declaration that (1) post-Closing impositions of these

duties are SB&D's responsibility; (2) no representation or warranty in the Agreement required

the Powers Parties to disclose their appeal to the CITT; (3) SB&D was obligated to mitigate its

potential losses as of July 2012, when it received DASs for the 2011 shipments; (4) SB&D did

not engage in commercially reasonable efforts to mitigate its Losses by waiting a year to start mitigating; (5) an estimated contingent loss does not constitute a "reasonable estimate" as that term is used in the Transaction Agreement; and (6) the Agreement bars SB&D's attempt to recoup, as a Loss, the alleged diminution value of the Powers Canada business.

*Second*, as to the ITW infringement claim, they seek a declaration that this claim (1) is too remote, so as to make it impossible for SB&D to reasonably estimate a contingent loss, and thus cannot justify withholding of escrowed funds, and (2) cannot satisfy the Indemnification Deductible.

*Third*, as to the Venezuelan trademark claim, they seek a declaration that (1) they did not breach any representations and warranties with respect to that claim, (2) the claim is also too remote, so as to make it impossible for SB&D to reasonably estimate a contingent loss, and thus cannot justify withholding of escrowed funds, and (3) this claim cannot satisfy the Indemnification Deductible.

*Fourth*, they seek specific performance and an order directing SB&D to cause the Escrow Agent to distribute $4.2 million to them.

*Fifth*, they bring a cause of action for conversion and seek a money judgment in an amount determined at trial, but no less than $4.2 million.

And *sixth*, pursuant to § 9.3(b) of the Transaction Agreement, they seek attorneys' fees and costs in bringing this action.

### 2.  SB&D's Counterclaims

On May 16, 2014, SB&D answered, counterclaimed against Jeffrey R. Powers, and filed a Third-Party Complaint against Jeffrey R. Powers, Christopher W. Powers, and Frederic B. Powers, III.  Dkt. 12–13.  SB&D also seeks multiple forms of relief.

*First*, SB&D brings a claim for breach of contract relating to the Canadian anti-dumping duties.  It alleges that the Powers Parties breached their representations and warranties that (1) the Transaction Documents fairly presented, in all material respects, the financial condition of the Powers Business, (2) there were no undisclosed liabilities of a Powers company other than those expressly reflected on the Combined Financial Statements, (3) there were no undisclosed actual or threatened Legal Proceedings, and (4) all Taxes being contested in good faith were disclosed.

*Second*, SB&D brings a claim for breach of warranty relating to these same four allegations.

*Third*, as to the Canadian anti-dumping duties, SB&D seeks a declaration that (1) the Powers Parties breached the representations and warranties by failing to disclose the imposition of these duties and the related litigation, (2) SB&D has provided a reasonable estimate of loss, (3) the Powers Parties have a duty to indemnify SB&D for post-Closing imposition of anti-dumping duties and related Losses, (4) the Powers Parties' breaches entitle SB&D to indemnification for Losses and Contingent Losses (including for the diminution in value of the Powers Business) to be paid from the Escrow Account, and (5) the Powers Parties were not entitled to any distributions from the Escrow Account.

*Fourth*, as to ITW's allegations of patent infringement, SB&D seeks a declaration that, *inter alia*, the Powers Parties (1) breached the representations and warranties by failing to disclose these allegations, and (2) have a duty to indemnify SB&D for Losses and Contingent Losses arising out of and in connection with ITW's allegations of patent infringement.

*Fifth*, as to the Venezuelan trademark claims, SB&D seeks a declaration that, *inter alia*, (1) the Powers Parties breached the representations and warranties by failing to disclose these claims, and (2) they have a duty to indemnify SB&D for Losses and Contingent Losses that are

16

associated with the loss of the exclusive right to use the Powers Fasteners Logo in Venezuela, upon such losses being properly quantified, to be paid from the Escrow Account.

### 3.    Summary Judgment Motions

On September 24, 2014, the Powers Parties moved for summary judgment, Dkt. 38, and filed a brief, Dkt. 40 ("Powers SJ Br."), and a declaration, Dkt. 39 ("Goldberg Decl."), in support of that motion.  The Powers Parties seek partial summary judgment on the first four counts of their Complaint, and dismissal of SB&D's five counterclaims.  *See* Dkt. 38.  In other words, the Powers Parties seek summary judgment on their claims for a declaration that they complied with the Transaction Agreement as to (1) the Canadian anti-dumping duties, (2) the Australian patent issue, and (3) the Venezuelan trademark issue, and for (4) specific performance, given SB&D's alleged breach.

The same day, SB&D moved for summary judgment as well, Dkt. 41, and filed a brief, Dkt. 42 ("SB&D SJ Br."), and three declarations, Dkt. 43 ("Markow Decl."); Dkt. 44 ("Shaya Decl."); Dkt. 45 ("Hooker Decl."), in support of its motion.  SB&D's motion is the mirror-image of the Powers Parties':  It seeks partial summary judgment on its five counterclaims (and, as to parties who had not sued it, its third party claims), and it seeks dismissal of the first four counts of the Powers Parties' Complaint.  In other words, SB&D seeks summary judgment on its causes of action for (1) breach of contract relating to the Canadian anti-dumping duties, (2) breach of warranties relating to those duties, (3) a declaration relating to the anti-dumping duties, (4) a declaration relating to the Australian patent issue, and (5) a declaration relating to the Venezuelan trademark issue.

On October 15, 2014, both parties filed briefs in opposition to the other's motion.  *See* Dkt. 48 ("Powers Opp. Br."), 49 ("SB&D Opp. Br."), and on October 29, 2014, filed reply briefs in further support of their motions.  *See* Dkt. 50 ("Powers Reply Br."), 51 ("SB&D Reply Br.").

On December 3, 2014, the Court held extended argument.  *See* Dkt. 59 ("Tr.").  The same day, the Court directed counsel to pursue settlement.  Dkt. 55.  The parties thereafter engaged in unsuccessful settlement discussions.  *See* Dkt. 56–58, 61–65.

## II.   Legal Standards

### A.   Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a question of material fact.  In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom

summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

### B.      Relevant Principles of New York Contract Law

The Transaction Agreement is construed under New York law. *See* TA, § 11.8.  Under that law, the interpretation of an unambiguous contract is a question of law to be addressed by the Court. *See, e.g.*, *Provident Loan Soc'y of N.Y. v. 190 E. 72nd St. Corp.*, 911 N.Y.S.2d 308, 309 (1st Dep't 2010); *805 Third Ave. Co. v. M.W. Realty Assocs.*, 58 N.Y.2d 447, 451 (1983). So too is the determination whether a contract provision is ambiguous. *See, e.g.*, *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004); *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990).  A contract is ambiguous only if "the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Goldman Sachs Grp., Inc. v. Almah LLC*, 924 N.Y.S.2d 87, 90 (1st Dep't 2011) (internal citation and quotation marks omitted); *see also Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005).  A contract is not ambiguous simply because the parties ask the Court to construe it differently. *See Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010); *Mt. Vernon Fire Ins. Co. v. Creative Hous. Ltd.*, 88 N.Y.2d 347, 352 (1996).

In determining the meaning of a contract, the Court "look[s] to all corners of the document rather than view[ing] sentences or clauses in isolation." *Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 99 (2d Cir. 1989) (citation and internal quotation marks omitted); *see also Kass v. Kass*, 91 N.Y.2d 554, 566 (1998).  "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *W.W.W. Assocs., Inc.*, 77 N.Y.2d at 162.  In other words, the Court's "primary objective is to give effect

to the intent of the parties as revealed by the language they chose to use." *Bolt Elec., Inc. v. City of New York*, 223 F.3d 146, 150 (2d Cir. 2000). Where the question of liability turns on applying the unambiguous language of a contract to undisputed facts, summary judgment is appropriate. *See Photopaint Techs LLC v. Smartlens Corp.*, 335 F.3d 152, 160 (2d Cir. 2003); *Lucente v. IBM Corp.*, 310 F.3d 243, 257 (2d Cir. 2002).

## III.   Discussion

The parties have sensibly proposed to address, at this stage, solely whether there have been any breaches of the Transaction Agreement. Assessing the damages attributable to any breach (*i.e.*, a false representation or warranty by the Powers Parties) would be addressed at a later stage, and would likely require discovery. *See* Tr. 3, 6, 7. Helpfully, too, the parties have largely stipulated to the facts relevant to liability—both argue that whether the Powers Parties made any misrepresentations justifying retention of escrow funds can and should be resolved by the Court at this stage. *See* Tr. 4–8. Because the parties' cross-motions are mirror images, the Court addresses these motions in tandem, sorted by the subject matter of the contested disclosure. The Court addresses first the Powers Parties' disclosures relating to Canadian anti-dumping duties; then relating to patent infringement claims in Australia; and then relating to the Venezuelan trademark claims. Finally, the Court turns to the Powers Parties' argument that, even if they breached various representations and warranties, these could not give rise to indemnifiable losses, so as to justify withholding escrowed funds.

### A.   Canadian Anti-Dumping Duties

The parties dispute two high-level issues relating to the Canadian anti-dumping duties. The first is whether the Powers Parties breached their contractual duty to accurately disclose "legal proceedings"—specifically, whether they were obliged to disclose that they had

unsuccessfully challenged, and were continuing to challenge, the imposition of Canadian anti-dumping duties.  The second is whether the Powers Parties breached their duty to accurately disclose taxes/liabilities—specifically, whether they inaccurately represented their financial condition by not disclosing $505,000 in anti-dumping duties for imports that occurred *before* the Closing Date, but which they received *after* the Closing Date.  The Court addresses these two issues in turn.  Each implicates multiple provisions of the Transaction Agreement.

### 1.    Legal Proceedings

In § 3.10 of the Transaction Agreement, the Powers Parties represented and warranted that:

> Except as disclosed on <u>Schedule 3.10</u>, there is no Legal Proceeding pending, or to the Knowledge of any Seller, threatened, by or before any arbitrator or Governmental Authority against a Seller or a Company or involving any of the former or present directors, officers, employees, agents, consultants, businesses, properties, rights, or assets of a Company or of a Seller that, in the case of any of the Sellers, relates to any of the Transferred Assets, the operation of the Powers Business or the Contemplated Transactions, nor, to the Knowledge of any Seller, is there any basis for the assertion of any of the foregoing.  Except as disclosed on <u>Schedule 3.10</u>, there are no judgments, orders, injunctions, decrees, stipulations or awards rendered by any Governmental Authority or arbitrator against any of the Sellers or the Companies or any of their former or present directors, officers, employees, agents, properties or assets that, in the case of any of the Sellers, relates to any of the Transferred Assets, the operation of the Powers Business or the consummation of the Contemplated Transactions.

"Legal Proceeding," a defined term, means: "(a) any lawsuit, action, hearing, investigation, charge, complaint, audit, notice, demand, claim, assessment, litigation, appeal, or other proceeding at law or in equity by or before a Governmental Authority or (b) any arbitral action." TA, Definitions.  "Governmental Authority," also a defined term, means "any foreign, domestic, federal, territorial, state or local governmental authority, quasi-governmental authority, instrumentality, court, government or self-regulatory organization, commission, tribunal or

21

organization or any regulatory, administrative or other agency, or any political or other

subdivision, department or branch of any of the foregoing." *Id.*

Thus, as to these issues, in § 3.10, the Powers Parties made two representations and

warranties relevant here. The first was that, except as disclosed in an accompanying schedule,

there was no lawsuit, litigation, or appeal—"involving" any of the Sellers' "businesses,

properties, rights, or assets"—that was "pending" or "threatened." The second was that, again

except as disclosed in an accompanying schedule, there were "no judgments, orders, . . . or

awards rendered by any Governmental Authority . . . against any of the Sellers or the Companies

. . . that, in the case of any of the Sellers, relates to . . . the operation of the Powers Business."

As to neither of these areas did the Powers Parties' accompanying Schedule disclose their

ongoing attempts to contest the imposition of Canadian anti-dumping duties.

The Court holds that, in light of this omission, the Powers Parties breached their duty to

make accurate representations and warranties, both as to the existence of any "orders" and as to

"pending" litigation.

### a.      Orders against the Powers Business

On March 14, 2012, "the CBSA issued a determination [] to Powers Canada confirming

that the imported Products were 'subject' goods and that the Canadian Anti-Dumping Duties, as

reflected in the DASs, were properly assessed." JSOF ¶ 30. That was just 40 days *before* the

Signing Date, April 23, 2012. The Powers Parties, however, did not disclose this ruling in the

Schedule accompanying the Transaction Agreement.

The Powers Parties were required to make that disclosure, because the CBSA ruling

easily falls within the definition of a Legal Proceeding. It was an "order"—a ruling resolving

Powers Canada's request for redetermination of the anti-dumping duties that had been imposed.

It was "rendered by a[] Governmental Authority"—the Canadian Border Services Agency (CBSA).[4]  It was "against any of the Sellers or the Companies," as the CBSA squarely ruled against Powers Canada on both issues in the appeal.  *See* JSOF ¶ 30.  And it concerned "the operation of the Powers Business," for Powers Canada regularly imported Products so as to conduct business in Canada, and Canadian import duties were therefore recurring.  (For instance, Powers Canada incurred import duties of $117,000 and $505,000 for shipments in 2010 and 2011, respectively.)  *See, e.g.*, Powers SJ Br. 18 ("The possible outcomes of [the CBSA and CITT] proceedings would have been either a benefit (refund) flowing back to Powers Canada, or the continuation of the status quo, *i.e.*, *CBSA would continue to issue DASs on Products imported in the ordinary course*.") (emphasis added).

The Powers Parties' counterarguments are unpersuasive.  They first argue that the CBSA order falls outside the scope of § 3.10 because the CBSA appeal was "brought *by* Powers Canada *against* Canadian authorities," whereas § 3.10 "speaks only of . . . judgments, injunctions, decrees, etc. 'against any of the Sellers or Companies.'"  Powers SJ Br. 18 (emphasis in original).  On this basis, the Powers Parties argue, they were not obliged to disclose the CBSA order because § 3.10 "was intended to schedule litigations *against* the Powers Business."  *Id.*

That argument fails, because it misreads the text of § 3.10.  Section 3.10 does indeed require the disclosure of adverse orders and judgments, *i.e.*, those entered *against* a Seller or Powers Company.  But, by its plain text, it does not limit the Powers Parties' disclosure duty to

---

[4] CBSA—the Canadian Border Services Agency—is a "Governmental Authority," as it falls within several alternative branches of that defined term.  It is a "foreign . . . governmental authority," a "department or branch" thereof, and a "regulatory, administrative or other agency."  TA, Definitions.  CBSA is on the list of "Government of Canada Departments, Agencies, Crown Corporations, Special Operating Agencies and other related organizations."  *See* www.canada.ca/en/government/dept/index.html (last visited Sept. 28, 2015).

adverse judgments entered in proceedings initiated against them:  All such adverse judgments

must be disclosed; the identity of the initiating party in these actions is irrelevant.  Given the

clear language of § 3.10, the Court may not add terms altering the parties' agreement.  *See, e.g.*,

*Law Debenture Trust*, 595 F.3d at 467 ("[A] written agreement that is complete, clear and

unambiguous on its face must be [interpreted] according to the plain meaning of its terms.")

(quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002)); *accord Reiss v. Fin.*

*Performance Corp.*, 97 N.Y.2d 195, 199 (2001) ("[C]ourts may not by construction add or excise

terms, nor distort the meaning of those used and thereby make a new contract for the parties

under the guise of interpreting the writing.") (citation and internal quotation marks omitted).

Nor, even if the Court had such authority, would it make sense to impute such a limiting

condition.  Adverse judgments commonly arise against plaintiffs, as, for example, where a party

seeks to steal a march on an adversary's anticipated damages action by filing preemptively for

declaratory relief.  *See, e.g.*, *Reliance Ins. Co. v. Six Star, Inc.*, 155 F. Supp. 2d 49, 54 (S.D.N.Y.

2001) ("Special circumstances justifying an exception to the [first-filed] rule exist where the first

suit constitutes an 'improper anticipatory filing' or was motivated solely by forum shopping.")

(quoting *Citigroup, Inc., v. City Holding Co.*, 97 F. Supp. 2d 549, 555–56 (S.D.N.Y. 2000)).

  The Powers Parties next argue that SB&D was, in fact, otherwise alerted—*i.e.*, outside of

the Transaction Documents—to the CBSA order.  SB&D denies this factual claim.  *See* Powers

SJ Br. 18, n.9; JSOF ¶ 59.  But even if the Powers Parties' factual claim were true, it would not

avail them.  The "Knowledge Savings Clause" of the Agreement, § 9.1(c), makes independent

knowledge by SB&D irrelevant to liability for the breach of a warranty.  It provides that the

"right to indemnification . . . based on any representation, warranty, covenant, or obligation

contained in . . . this Agreement will not be affected by any investigation . . . conducted or any

Knowledge acquired at any time, whether before or after the Closing Date, with respect to the accuracy or inaccuracy of, or compliance with, such representation, warranty, covenant, or obligation."

Consistent with this provision, under New York law, where a buyer seeks express assurances as to the accuracy of the seller's express warranties, as here, "the general rule is that a buyer may enforce an express warranty even if it had reason to know that the warranted facts were untrue." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007); *see also Rogath v. Siebenmann*, 129 F.3d 261, 265 (2d Cir. 1997) (buyer with knowledge of falsity of warranted facts may purchase seller's warranty as insurance against future claims). To be sure, this "rule is subject to an important condition. The [buyer] must show that it believed that it was purchasing seller's promise regarding the truth of the warranted facts." *Merrill Lynch*, 500 F.3d at 186. Ordinarily, this requires "evaluat[ing] both the extent and the source of the buyer's knowledge about the truth of what the seller is warranting." *Rogath*, 129 F.3d at 264. Yet this point, too, is subject to an important qualification: "the buyer [may] expressly preserve[] his rights under the warranties." *Id.* (citation omitted); *see also Galli v. Metz*, 973 F.2d 145, 151 (2d Cir. 1992) ("Where a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach . . . *unless* the buyer expressly preserves his rights under the warranties (as CBS did in *Ziff-Davis*) . . . .") (emphasis added).

A decision of the New York Court of Appeals, *CBS, Inc. v. Ziff-Davis Publishing Co.*, 75 N.Y.2d 496 (1990), applies these principles to reasonably close facts. There, the seller promised that its representations and warranties were "true and correct as of the time of the closing," and

that all "representations and warranties . . . shall survive the closing, notwithstanding any investigation made by or on behalf of the other party." *Id.* at 500.  During its due diligence (between the signing and closing dates), the buyer, CBS, expressed doubts to the seller, Ziff-Davis Publishing, as to the accuracy of Ziff-Davis's financial information; nonetheless, the parties went forward with the transaction and preserved their rights.  *Id.* at 500–01.  After the deal closed, CBS brought suit; the lower courts dismissed its breach of warranty claim.  *Id.* at 501.  The Court of Appeals reversed and reinstated that claim.  It reasoned that "[t]he critical question is not whether the buyer believed in the truth of the warranted information, as Ziff-Davis would have it, but 'whether [it] believed [it] was purchasing the [seller's] promise [as to its truth].'"  *Id.* at 503 (quoting *Ainger v. Mich. Gen. Corp.*, 476 F. Supp. 1209, 1225 (S.D.N.Y. 1979), *aff'd* 632 F.2d 1025 (2d Cir. 1980)).  The Court of Appeals explained that it was not suggesting that there need be no reliance by the buyer on the seller's warranties; rather, "the required reliance is established if, as here, the express warranties are bargained-for terms of the seller."  *Id.* at 506 n.5.  Thus, where—as in *CBS*—"the buyer has purchased the seller's promise as to the existence of the warranted facts, [the fact that the buyer has doubts] . . . should not relieve the seller of his obligations under the express warranties."  *Id.* at 504 (1990) (citing, *inter alia*, *Metro. Coal Co. v. Howard*, 155 F.2d 780, 784 (2d Cir. 1946) (Hand, J.)).

    The relevant provisions in the Transaction Agreement in this case are analogous to those in *CBS*:  The seller warranted that all representations were true and accurate at both the Signing and Closing, and that any investigation by the buyer did not affect these representations.  If anything, the warranties in the present case were more clearly binding, in that the Powers Parties expressly made the series of representations and warranties in Article III in order "[t]o induce [SB&D] to enter into this Agreement," TA, Art. III, and the parties explicitly agreed that "[t]he

right to *indemnification*" would not be affected by "any Knowledge acquired at any time" concerning the accuracy of any representation or warranty, TA, § 9.1(c) (emphasis added).  In sum, because SB&D expressly "purchased the seller's promise as to the existence of the warranted facts," *CBS*, 75 N.Y.2d at 504, the Court rejects the Powers Parties' argument.

Accordingly, the Court holds, the Powers Parties breached § 3.10 by failing to disclose, or schedule, the CBSA order of March 2012.

### b.      Pending or threatened litigation

The Powers Parties also represented, as of the May 31, 2012 Closing, that there was no "pending" or "threatened" lawsuit, litigation, or appeal "involving" any of the Sellers' "businesses, properties, rights, or assets."  The relevant dates here are that on March 14, 2012, CBSA issued its determination, triggering a 90-day window for the Powers Parties to appeal; and that on June 7, 2012, Powers Canada appealed the CBSA order to the CITT.  JSOF ¶¶ 30, 38.  The Powers Parties argue that because their formal notice of appeal post-dated the Closing, there was no pending lawsuit, litigation, or appeal as of the Closing, and therefore no disclosure was required.

The Court holds otherwise, based on the terms "litigation" and "pending" (which are used in the definitions section and in § 3.10, respectively).  Although the Transaction Agreement does not define these terms, under New York law, they are given their ordinary, dictionary meaning. *See, e.g.*, *Mazzola v. Cty. of Suffolk*, 533 N.Y.S.2d 297, 297 (2d Dep't 1988) (citing *Allied Chem. Corp. v. Alpha Portland Indus.*, 397 N.Y.S.2d 480 (4th Dep't 1977)); *10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2011) (citing, *inter alia*, *Mazzola*, and relying on Black's Law Dictionary definition).

Here, the term "litigation" is defined as a formal legal challenge to resolve a controversy. *See, e.g.*, MacMillan Dictionary ("use of the legal system to settle a disagreement"), *available at*

27

http://www.macmillandictionary.com/us/dictionary/american/litigation; Oxford Dictionary ("the process of taking legal action"), *available at* http://www.oxforddictionaries.com/us/definition/ american_english/litigation; Black's Law Dictionary ("A judicial controversy.  A contest in a court of justice, for the purpose of enforcing a right."), *available at* http://thelawdictionary.org/ litigation; and Business Dictionary ("ultimate legal method for settling controversies or disputes between and among persons, organizations, and the State"), *available at* www.businessdictionary.com/definition/litigation.html (all last visited Sept. 28, 2015).  Powers Canada's challenge to the DASs it received was clearly a "litigation"—Powers Canada disputed the DASs it received, and formally contested the assessment of these import duties on two grounds.  *See* JSOF ¶¶ 29–30, 38.

A litigation can span multiple stages.  In federal courts in this country, a litigation may span proceedings before a district court, a court of appeals, and the United States Supreme Court. In between these stages, the party that lost immediately below faces a deadline within which to file a notice of appeal.  *See, e.g.*, Fed. R. App. P. 4(a)(1)(A) ("In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from."); 28 U.S.C. § 2101 (time for appeal or petition for a writ of certiorari).  A loss in district court thus concludes a *stage* of the litigation, but does not terminate the litigation itself.  As any litigator would understand, the litigation itself remains ongoing until either the deadline for appeal has lapsed without a notice of appeal having been filed, or the case has been finally resolved (whether on the merits or as a result of a denial of certiorari) by the Supreme Court.  *See, e.g.*, Tr. 12–13.

Notwithstanding the different legal institutions involved, the foregoing logic similarly applies to the litigation in Canada regarding anti-dumping duties.  The Powers Parties had been

on the losing end of an adverse judgment by the CBSA, and under Canadian law, had a 90-day deadline in which to appeal the adverse determination to the CITT.  *See* JSOF ¶ 28; *see also* Dkt. 54-1 (Memorandum D14-1-3: Procedures for Making a Request for a Re-Determination or an Appeal under the Special Import Measures Act)).  The Powers Parties' litigation as to that point was, therefore, ongoing—and not terminated—unless and until that deadline passed without an appeal's having been initiated.

Powers Canada's litigation over the DASs thus remained an ongoing legal proceeding as of May 31, 2012.  And this litigation was, as of that date, "pending."  "Pending" is defined as "[b]egun, but not yet completed," Black's Law Dictionary, *available at* http://thelawdictionary.org/pending; "not yet decided, confirmed, or finished," Collins Dictionary, *available at* www.collinsdictionary.com/dictionary/english/pending; and "waiting to be dealt with, settled, or completed," MacMillan Dictionary, *available at* http://www.macmillandictionary.com/us/dictionary/american/pending_1 (all last visited Sept. 28, 2015).  The Powers Parties argue that between the Signing Date and the Closing Date, because they had not yet formally noticed an appeal to the CITT of the CBSA's order, there was no proceeding "pending" in either forum, in the sense, presumably, that neither body had before it an unresolved decision to render.  Powers Opp. Br. 6.  But as used in § 3.10 of the Transaction Agreement, "pending" modifies the broader term "litigation."  That litigation was still ongoing, because, while the appeal clock remained unexpired, it was not "completed" or "finished."

Accordingly, the Court holds, the Powers Parties' failure to disclose the CBSA's March 14, 2012 order breached the requirement of § 3.10 requiring them to disclose "pending . . . litigation."  *See generally Metromedia Co. v. Fugazy*, 983 F.2d 350, 359–60 (2d Cir. 1992)

(affirming directed verdict in buyers' favor finding that failure to disclose pending and actual litigations breached representations and warranties in the purchase agreement).

### c.      Liens/Contesting Taxes

SB&D separately argues that the non-disclosure of the Powers Parties' challenges to the imposition of anti-dumping duties violated § 3.15(a) of the Transaction Agreement.  SB&D argues that, under § 3.15(a), "the Sellers represented and warranted that all Taxes being contested in good faith were disclosed in Schedule 3.15(a)," and that this required disclosure of the CBSA order, because the anti-dumping duties were Taxes.  SB&D SJ Br. 11; *see also* SB&D Opp. Br. 11–12.  The parties agree that anti-dumping duties are Taxes.  JSOF ¶ 45.  But SB&D's claim that disclosure was required under § 3.15(a) fails for other reasons.

Section 3.15(a) does not function, effectively, as "§ 3.10 for Taxes"—it does not require the disclosure of tax-specific legal proceedings.  Instead, the relevant sentence of § 3.15(a) states:

> There are no Liens on any of the Transferred Assets or any of the assets, rights or properties of any of the Companies with respect to Taxes, other than liens for Taxes not yet due and payable or for Taxes that are being contested in good faith through appropriate proceedings (which are disclosed on <u>Schedule 3.15(a)</u>) and for which appropriate reserves have been established on the Combined Financial Statements.

In this provision, the Powers Parties thereby represented that there were no *liens* on their assets, other than liens for Taxes being contested in good faith.  This provision thus required the disclosure of certain liens, but it did not impose a freestanding obligation to disclose ongoing challenges to tax determinations.  And SB&D does not allege that any such lien in fact existed.

Accordingly, the Powers Parties complied with § 3.15(a).  The Court rejects this discrete challenge by SB&D.

### 2.     Taxes/Liabilities—Financial Condition, Undisclosed Liabilities, Payment of Taxes before Closing, and Material Deficiencies

SB&D separately argues, in relation to Canadian anti-dumping duties, that the Powers Parties failed to properly disclose the $505,000 in duties imposed on imports that occurred *before* the Closing Date but assessed *after* the Closing Date.  SB&D contends that, by not disclosing such duties, the Powers Parties breached their warranties that they (1) had accurately represented the Powers Business's financial condition, (2) had no undisclosed liabilities, (3) would, prior to Closing, pay all taxes that were due and payable, and (4) had no material tax deficiencies.

The provisions relevant to this dispute are quickly summarized.  In § 3.6 of the Transaction Agreement, the Powers Parties represented and warranted that the Agreement and the Combined Financial Statements in Disclosure Schedules 3.6(a) and (b) "fairly present[ed] in all material respects" the financial condition and results of operations for the Powers Business for the fiscal years ending December 31, 2010 and 2011, and the quarter ending March 31, 2012. In § 3.9 of the Agreement, the Powers Parties similarly represented and warranted that there were no undisclosed liabilities "of a Company or encumbering any of the Transferred Assets of any kind, other than" those expressly reflected on the Combined Financial Statements, or otherwise disclosed in the Transaction Documents.  In § 3.15(a) of the Agreement, the Powers Parties represented and warranted that, *inter alia*, "all Taxes due and payable on or before the Effective Date have been or will be fully and timely paid on or before the Closing Date" and "[e]ach of the Companies has paid, withheld, or accrued any and all Taxes in respect of the conduct of its business or the ownership of its property and in respect of any transactions for all periods (or portions thereof) through the close of business on the Closing Date."  Finally, in § 3.15(b), the Powers Parties represented and warranted that, except as disclosed, "no material

31

deficiencies have been asserted (or are expected to be asserted) against any of the Companies as a result of any examinations by a Tax Authority and no material issue has been raised by any Tax Authority examination that, by application of the same principles, might result in a proposed deficiency for any other period not so examined."

SB&D's argument as to each of these representations and warranties is that the Powers Parties' financial statements "do not disclose the imposition of Anti-Dumping Duties on the Products" for 2011—and as a result, the Powers Business's financial condition (§ 3.6) was inaccurately represented; there were undisclosed liabilities (§ 3.9) and material tax deficiencies (§ 3.15(b)); and the Powers Business did not pay all taxes that were due and payable prior to the Closing (§ 3.15(a)). *See, e.g.*, SB&D SJ Br. 12; *see also* Tr. 28 (counsel for SB&D: "3.9 is implicated in the same way as 3.6. . . .  Same analysis.").

All of SB&D's arguments are based on a fundamental factual premise: anti-dumping duties are due as soon as the Products are imported.  In other words, even though the Powers Parties were DAS'd *after* the Closing, *see* Tr. 22, SB&D contends that the receipt of a DAS is not the "triggering" event for liability; but that the import was.  *See, e.g.*, SB&D Reply Br. 4 ("Sellers were liable at the time of importation."); *see also* Tr. 17 ("The Court:  In other words, there is a duty to pay the antidumping duties as the goods cross the border?  [Counsel for SB&D]: Correct.").  As a result, SB&D argues, the Powers Parties became liable in 2011 for $505,000 in anti-dumping duties, not at the point when they were DAS'd for those imports, which was after the Closing.  SB&D asserts that a DAS is issued when the Canadian authorities come after the importer for unpaid duties that were *previously* due, but have gone paid.  *See* SB&D Reply Br. 4.

The Powers Parties contest this factual premise:  They argue that tax liability is not triggered by importation alone, but by the post-importation receipt of a DAS.  *See, e.g.*, Powers Reply Br. 8 ("[A]n assessment of Anti-Dumping Duties is only triggered by (i) an act of importation and (ii) a determination by CBSA that Anti-Dumping Duties are owed."); *id.* at 7 ("[B]ecause there were no unpaid, due, or outstanding DASs" as of the Closing Date, "there were no undisclosed liabilities and no unpaid Taxes.").  At argument, counsel for the Powers Parties explained their view:

> **Mr. Kaplan**:  We have always said it's a two-part process.  It's not just importation, but you have to be DAS'd.  You have to have notice by the CBSA that these goods that come in are subject to tariff duties.  Unless you are actually DAS'd, received a detailed adjustment statement, you are not required to pay those duties.
>
> * * *
>
> **Mr. Kaplan**:  [The Canadian Border Agent] has the ability to DAS within the first 30 days.  And if he doesn't DAS within the first 30 days, it is presumed that the accounting does not have any tariffs associated with it.

Tr. 29–30, 37.  And, the Powers Parties note—as is undisputed—that "[a]s of the Closing Date, there were no unpaid, due, or outstanding DASs received by Powers Canada that concerned the imposition of Canadian Anti-Dumping Duties on Pre-Closing shipments of carbon steel fasteners."  JSOF ¶ 37.  Thus, the Powers Parties assert that because they had yet to be DAS'd, their various representations premised on the absence of extant duties (as to taxes, liabilities, and financial condition) were literally true.

Regrettably, on this central question involving the mechanics of assessment of Canadian anti-dumping duties, the parties' submissions are less than pellucid.  The parties submitted two short CBSA memoranda.  *See* Dkt. 54-1 (Memorandum D14-1-3: Procedures for Making a Request for a Re-Determination or an Appeal under the Special Import Measures Act) ("Memorandum D14-1-3"); Memorandum D14-1-6: Liability and Payment of Provisional Duty,

Anti-Dumping Duty, and Countervailing Duty under the Special Import Measures Act ("Memorandum D14-1-6").  These provide some guidance on some issues, including: the appeal clock for both a CBSA and CITT determination (90 days), *see* Memorandum D14-1-3, ¶¶ 17, 21; the expedited and interim review processes, *see id.* ¶ 13; Memorandum D14-1-6, ¶ 9; how duties apply in the case of "goods of a NAFTA country," Memorandum D14-1-6, ¶ 12; refunds of duties, *see id.* ¶ 14; when one can expect to receive a DAS, *see id.* ¶ 21; Memorandum D14-1-3, ¶ 30; the scope of issues that an importer may appeal, Memorandum D14-1-3, ¶ 19; and when and whether interest is due on unpaid duties, *id.* ¶¶ 29–30.  But they do not clearly answer the question of the point at which an importer becomes liable to pay such duties.  Rather, as to that point, the memoranda state the following about the anti-dumping process:

1. "Dumped or subsidized goods imported into Canada of the same description as the goods named in a Tribunal [*i.e.*, CITT] order or finding of injury or threat of injury are subject to anti-dumping or countervailing duty.  Anti-dumping duty is the margin of dumping, that is, the amount that the normal value exceeds the export price."  Memorandum D14-1-3, ¶ 12.

2. "A liability for payment of anti-dumping or countervailing duty also arises where a panel has reviewed a decision by the Tribunal [*i.e.*, CITT] to rescind an injury finding, and a panel has referred the rescinding order back to the Tribunal for reconsideration."  Memorandum D14-1-6, ¶ 6.

3. "Under the SIMA, a finding of injury or threat of injury . . . and the associated special protection in the form of anti-dumping or countervailing duties expire five years from the date of the finding or the order, unless an expiry review has been initiated."  Memorandum D14-1-3, ¶ 14.

4. "The importer becomes immediately liable for payment of provisional duty, anti-dumping duty, or countervailing duty upon the importation of goods subject to such duty."  Memorandum D14-1-6, ¶ 8.

5. "The payment of anti-dumping or countervailing duty is due regardless of any intention by the importer to request a re-determination in respect of the description of the goods, normal value, export price, or the amount of subsidy."  *Id.* ¶ 11.

6.  "Where goods have been accounted for, and a customs officer determines within 30 days that the proper amount of anti-dumping duty or countervailing duty was not paid, the demand for payment is made on Form B2-1, *Canada Customs – Detailed Adjustment Statement* (DAS)."  *Id.* ¶ 21.

7.  "A CBSA officer determines, within 30 days after the goods were accounted for, whether the imported goods are of the same description as goods to which the order or the finding of the Tribunal [*i.e.*, CITT] applies, the normal value or the amount of the subsidy on the imported goods of the same description, and the export price of those goods.  Where, in the case of any imported goods, a determination is not made within the 30 days, that determination is deemed to have been made on the 30th day after the goods were accounted for and in accordance with any representations made by the person accounting for the goods at the time of accounting."  Memorandum D14-1-3, ¶ 15.

8.  "A designated officer or the President may re-determine the normal value, the export price, or the amount of subsidy of any goods, or whether the imported goods are the same as the goods named in an injury finding of the Tribunal, within two years of the determination made pursuant to section 56 of SIMA."  Memorandum D14-1-6, ¶ 22.

These provisions are a helpful start, but, without more, they can be read to support each party's position.  To be sure, certain paragraphs of the Memorandum D14-1-3 (*e.g.*, ¶¶ 8 and 11) suggest that the duty is owed upon the moment of importation.  And SB&D's argument to this effect is, on balance, decidedly the more persuasive to the Court.  SB&D's thesis has obvious logic to it:  As the Court noted at argument, the Powers Parties appear to treat a duty as due only if the importer gets caught and is later assessed a duty.  By this logic, an importer that does not pay a duty upon importation and goes uncaught never owed such a duty in the first place, even if application of the governing standards to the facts dictated that a duty was due.[5]  *See, e.g.*, Tr. 31.  On the other hand, there is enough ambiguity in these provisions to leave uncertain the point

---

[5] By analogy, applying the Powers Parties' reasoning, a United States taxpayer who declined to pay federal income taxes for a given tax year did not owe such taxes on April 15 of the following year, but rather, only when the Internal Revenue Service came after him and assessed him for unpaid taxes.  This outcome is assuredly not correct.

at which Canadian authorities treat such duties as due, because certain provisions can be read to suggest that a duty is due only upon a subsequent determination. *See, e.g.*, Memorandum D14-1-3, ¶ 15; Memorandum D14-1-6, ¶ 21. The issue is one of Canadian law and regulatory procedure. The record is devoid of any affidavits from the CBSA or CITT on this point. And the parties have not directed the Court to any on-point Canadian law that might resolve the issue. Although unlikely, it is also conceivable that factual peculiarities about the importation practices at issue here might be relevant to this determination.

Accordingly, despite both parties' insistence that the issue is ripe for summary judgment, the Court is unprepared to so rule at this point. There is a "genuine dispute as to a[] material fact," Fed. R. Civ. P. 56(a), specifically as to the point at which, under Canadian law and export procedure, an import duty is due for imports of the nature here. Accordingly, the Court denies both parties' motions at this time as to the cluster of interrelated tax, liability, and financial matters (*i.e.*, financial condition (§ 3.6), undisclosed liabilities (§ 3.9), payment of taxes before closing (§3.15(a)), and material deficiencies (§ 3.15(b)). To the extent the parties believe it productive, they are at liberty, while pursuing discovery as to damages issues, to simultaneously conduct discovery as to the assessment process with respect to the dumping duties at issue here, so as to enable the Court, at a later point, to resolve this open issue.

### B.    Australia

The Court turns next to the dispute as to threatened patent litigation in Australia. Before the Closing Date, Powers Australasia—a subsidiary of Powers—received a letter that (1) alleged that Powers Australasia was infringing ITW's patent, and (2) threatened to bring an infringement

36

lawsuit against Powers Australasia.  JSOF ¶¶ 67–68.  The Powers Parties did not disclose this

threat in the Transaction Documents.  JSOF ¶ 69.[6]

The Court holds this threat of litigation also was required to be disclosed.  ITW's claim

of patent infringement and its threat to sue over it clearly were "threatened" "Legal Proceedings"

under § 3.10.  Notably, the Powers Parties do not seriously dispute this point.  They instead

argue that any breach is "irrelevant" because SB&D has yet to provide a "reasonable estimate"

of its Contingent Parent Losses in connection with this claim of errant disclosure.  (The Powers

Parties have assumed the defense of this claim.  *See* JSOF ¶ 72; Powers SJ Br. 20.)

The Court holds otherwise.  The Agreement provisions on which the Powers Parties rely,

§§ 2.6(c)(iii) and (iv), do not define their disclosure obligations.  These provisions instead bear

on the calculative question of whether, and how much, cash should be distributed to the Sellers

from the Indemnity Holdback.  For instance, subsection 2.6(c)(iii) provides that the parties "shall

jointly instruct the Escrow Agent to distribute to Sellers' Representative an amount equal to the

excess of the Indemnity Holdback over the sum of (A) $12,750,000, <u>minus</u> (B) the aggregate

amount of Reductions, <u>minus</u> (C) the aggregate of Parent's reasonable estimate of the contingent

or non-liquidated Parent Losses that a member of the Parent Group may sustain . . . ."  TA,

§ 2.6(c)(iii) (emphasis in original).  The purpose of SB&D's making a "reasonable estimate" is

---

[6] Although the threat of litigation (on April 27, 2012) came four days after the Signing Date
(April 23, 2012), the Powers Parties had a "duty to update" their representations before the
Closing (May 31, 2012), because the Agreement provided that their representations and
warranties were "true and accurate" as of both the Signing Date and the Closing Date.  TA, Art.
III (seller warranty that, "as of the Effective Date and as of the Closing Date (as if such
representation and warranty was remade on the Closing Date), the statements contained in this
<u>Article III</u> are true and correct").

thus to determine the size of distributions owed to the Sellers under the distribution formulas in these subsections.

At the stage at which it withheld funds from escrow, it was sufficient for SB&D to estimate that its aggregate Contingent Parent Losses—including those associated with the Canadian anti-dumping duties—were, as of November 30, 2013, at least $4,205,169, the sum withheld from distribution.  The Court has no occasion now to determine what, if any, losses SB&D may sustain on account of the undisclosed threat of patent litigation.  After discovery and briefing with respect to damages, the Court may—or may not—have occasion to address this question.

### C.      Venezuela

The parties next dispute the accuracy of the disclosures about the ongoing Venezuelan dispute concerning the trademark for the Powers Fasteners Logo.  As reviewed above, between 2005 and 2008, Anclajes (the sole authorized distributor of products of the Powers Business in Venezuela) and a separate company, Anchor, filed trademark applications for this logo, and also filed oppositions to the other's applications.  *Id.* ¶¶ 85–89.  The applications remain pending before the Venezuelan Trademark Office (the "VTO").  *Id.*

The Powers Parties disclosed, in Schedule 3.12(a) accompanying the Agreement, that their *own* trademark applications were pending before the VTO.  *See* Goldberg Decl., Ex. L, at 38.  Indeed, on three consecutive rows of Schedule 3.12(a), the Powers Parties listed each application as "PENDING."  *Id.*  And Schedule 3.12(a) made extended disclosures about these applications:  For each it set out, in separate columns, (1) the mark at issue; (2) the relevant country; (3) the matter code; (4) the international class; (5) the status of the application (*e.g.*, "Awaiting Filing," "Pending," "Registered," "Allowed," "Statement of Use Accepted,"

"Accepted," "Published," "Lapsed," and "Abandoned"); (6) the application number; (7) the file

date; (8) the registration number; (9) the registration date; (10) next action due and the next

action due date; (11) who to contact; and (12) the owner.  SB&D, however, contends that the

Powers Parties breached three representations and warranties by not disclosing (1) that they did

not own the trademarks at issue, (2) Anchor's competing applications for the same marks, and

(3) Anchor's oppositions to Anclajes' trademark applications.

     The Court rejects SB&D's various contentions.

     SB&D first argues that, "in violation of Section 3.23, the Sellers misrepresented and

failed to disclose that the Powers Business did not, in fact, have 'good and marketable title' to

the Powers Fastener trademarks in Venezuela."  SB&D SJ Br. 23.  But SB&D misleadingly

describes what the Powers Parties actually represented in § 3.23(a).  That provision states that,

except as described in Disclosure Schedules, "(i) Powers III has good and marketable title to the

Transferred Assets and (ii) each Company has good and marketable title to its assets and

properties, in each case free and clear of Liens other than Permitted Liens."  JSOF ¶ 90.

"Transferred Assets" includes "Intellectual Property," a defined term that means:

> any or all of the following and all rights in, arising out of, or associated therewith
> (including all applications or rights to apply for any of the following . . .): (i) all
> United States, international and foreign: (A) patents, utility models, and
> applications therefor . . . ; (B) all trade secrets . . . ; (C) all mask works and
> copyrights . . . ; (D) all rights in World Wide Web addresses and domain names and
> applications and registrations therefor . . . ; (E) all trade names, logos, trademarks
> and service marks, trade dress and all goodwill associated therewith throughout the
> world; . . . and (ii) any and all of the following: computer software and code . . . .

TA, Definitions.  Critically, "Intellectual Property" includes "application[s]"—indeed, the

definition uses the word "application" three times, along with the term "apply for."  The import

is clear:  The Powers Parties were selling (and disclosing) not only their patents, trademarks, and

copyrights, but also their "applications" for such rights and their "right[] to apply for" such rights

in the future.  For this reason, the Disclosure Schedules list a number of "pending" applications

in the Disclosure Schedules.  *See, e.g.*, Goldberg Decl., Ex. L.

Viewed in this light, SB&D is wrong to depict § 3.23 as a representation that the Powers

Parties had "'good and marketable title' to the Powers Fastener *trademarks* in Venezuela."

SB&D SJ Br. 23 (emphasis added).  Rather, the Powers Parties were guaranteeing only that they

had good and marketable title to their *trademark applications*.  SB&D does not allege any defect

in title pertaining to the Powers Parties' ownership of those applications, *e.g.*, the existence of a

Lien, nor do the facts here meet the contractual definition of Lien.[7]  SB&D's first argument thus

is a non-starter.

SB&D next argues that the Powers Parties were obliged to disclose the fact that another

party had filed a competing (and also pending) application for the same trademarks.  *See* SB&D

SJ Br. 23.  But SB&D has not pointed to any provision in the Agreement that required this

disclosure.  Section 3.23 did not explicitly require it.  The parties of course could have negotiated

to include such a provision, but they did not.  Particularly given the comprehensiveness of the

Agreement on other points, the Court declines to override the parties' decision *not* to include

such a guarantee.  *See, e.g.*, *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 335

(2d Cir. 2005) (holding that "extra-contractual setoff rights fall outside the scope of the"

pertinent contractual clause partly because "the parties could have, but did not, include within

their agreement a provision creating setoff rights"); *Process Am., Inc. v. Cynergy Holdings, LLC*,

No. 12 Civ. 772 (BMC), 2014 WL 3844626, at *9–10 (E.D.N.Y. Apr. 30, 2014) (rejecting

---

[7] "Lien" is defined as "any pledge, security, interest, lien, charge, encumbrance, mortgage, trust deed, or other restriction having like or similar effect on sale, transfer or disposition, whether imposed by agreement, law or otherwise."  TA, Definitions.

argument that "*any* Event of Default . . . would constitute a 'material breach'" of the contract, because "[t]he parties could have drafted [the relevant provisions] to refer to a 'termination for cause,' 'default,' 'Event of Default' or any of a number of other terms.  They did not, and instead chose the term 'breach' in both instances."), *appeal docketed*, No. 15-2081 (2d Cir. June 29, 2015).  And there may have been good reason for the absence of such a provision, in that there is no assurance as to whether, and when, a trademark application will be granted.  Indeed, although Anclajes' three applications were filed in 2006, 2006, and 2008, they remain pending nearly a decade later.  *See* Goldberg Decl., Ex. L, at 38; JSOF ¶ 89.  Conceivably the parties viewed the fact or possibility of a pending trademark application by a different party as unimportant.

Third, SB&D contends that the Powers Parties violated § 3.10, on the ground that Anchor's opposition to Anclajes' trademark applications was a Legal Proceeding and thus required to be disclosed.  But an opposition to a trademark application does not meet the definition of "Legal Proceeding"—it is not a "lawsuit, action, hearing, investigation, charge, complaint, audit, notice, demand, claim, assessment, litigation, appeal, or other proceeding at law or in equity by or before a Governmental Authority" or an "arbitral action."  TA, Definitions.  Tellingly, although claiming that Anchor's oppositions qualified as a Legal Proceedings, SB&D does not explain how or why.  Having closely considered each of these terms, the Court's view is that none fits.  Accordingly, the Court rejects this claim of breach.[8]

---

[8] The Court also finds no credible allegation that the Powers Parties violated § 3.12(d) of the Transaction Agreement, in which they represented that "[t]he Powers Intellectual Property as currently or formerly owned, licensed, or used or proposed to be used by Powers III or any of the Companies, and each of Powers III's and the Company's conduct of the Powers Business as currently and formerly conducted and proposed to be conducted by it have not, do not and will not infringe, violate or misappropriate the Intellectual Property of any Person.  None of the [Powers Parties] nor any of the Companies has received any communication, and no Legal Proceeding has been instituted, settled or, to the Knowledge of the [Powers Parties], threatened that alleges any such infringement, violation, or misappropriation."

In sum, the Court rules for the Powers Parties as to all aspects of the Venezuelan dispute.

### D.     Indemnifiability of SB&D's Claimed Losses

The Court, finally, addresses the Powers Parties' argument that, even if they breached various representations and warranties, these do not give rise to indemnifiable losses, so as to justify withholding escrowed funds.  At this stage, that argument is quickly put down.

SB&D argues that, in light of the undisclosed imposition of anti-dumping duties, it has already suffered—and will continue to suffer—substantial losses.  For instance, SB&D asserts that the fact of recurrent anti-dumping duties significantly reduces the profitability of Powers Canada, and thereby the value of the Powers Business it purchased.  *See, e.g.*, JSOF ¶ 60; SB&D SJ Br. 1, 8.  SB&D also states that it has spent considerable sums in its attempts to mitigate—*i.e.*, to reduce the amount of anti-dumping duties in the future, and/or to find alternate sources of the imported Products.  SB&D therefore seeks indemnification—and correspondingly declines to release escrow funds—by claiming several categories of loss: (1) the diminished value of the Powers worldwide business, (2) the cost of SB&D's mitigation efforts, and (3) Canadian anti-dumping duties for *post*-Closing periods.  JSOF ¶¶ 60–64.

The Powers Parties respond that, even if they did breach warranties and representations, SB&D's claims for indemnification could not have caused losses (or contingent losses) so as to support a claim for indemnification (or a withholding of escrow).  *See* Powers SJ Br. 6–13.

The Powers Parties are correct that, if the breaches of warranties and representations could not have caused indemnifiable losses, they could not have supported a withholding of escrow funds.  "Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach *directly* and *proximately* caused his or her damages."  *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004)

(citing *Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205, 209 (1886)).  However, it is also correct (and the parties agree, *see, e.g.*, Tr. 3, 6, 7) that, at this liability stage, it is premature for the Court to quantify damages, whether flowing from the breaches the Court has found (as to Legal Proceedings relating to anti-dumping duties and as to ITW's threat of patent litigation in Australia) or from the claim of breach that the Court has yet to resolve (as to the financial impact of the anti-dumping duties).  Therefore, the issue before the Court is simply whether damages of the types that SB&D claims are, as a matter of law, cognizable under the Transaction Agreement.  If so, SB&D is within its right to refuse, pending the outcome of this lawsuit, to the release of escrow funds.

The Court holds that SB&D may pursue damages based on diminution in value under the Transaction Agreement.  SB&D therefore may withhold escrow funds on the theory that the Powers Parties' various breaches (including those relating to the legal proceedings challenging anti-dumping duties) diminished the value of the Powers Business.  Specifically, under § 9.2 of the Agreement, the Sellers agreed to indemnify SB&D

> for all Losses imposed on or incurred by [SB&D] ('**Parent Losses**') based upon, arising out of, in connection with, or resulting from, directly or indirectly, (i) the inaccuracy or untruth of any of the representations or warranties made by the [Powers Parties] pursuant to any Transaction Document or in any certificate or instrument delivered by or on behalf of the [Powers Parties] pursuant to any Transaction Document other than the Fundamental Representations; (ii) the inaccuracy or untruth of any of the Fundamental Representations; (iii) the breach by the [Powers Parties] of, or the failure of the [Powers Parties] to perform, observe or comply with, any covenant or agreement made by the [Powers Parties] in any Transaction Document; (iv) any of the Indemnified Liabilities; (v) any PL Liabilities; . . . .

Losses, in turn, is a defined term that means:

> [A]ll demands, claims, actions or causes of action, assessments, losses, damages, costs, expenses, liabilities, judgments, awards, fines, sanctions, penalties, charges and amounts paid by a Person in settlement, including reasonable costs, fees and expenses of attorneys, experts, accountants, appraisers, consultants, witnesses,

investigators, and any other agents or representatives of such Person, but specifically excluding (i) any costs incurred by or allocated to an Indemnified Person with respect to time spent by employees of the Indemnified Person or any of its Affiliates, (ii) any lost profits, consequential damages, punitive damages or opportunity costs (except to the extent assessed in connection with a third party claim with respect to which the Person against which such damages are assessed is entitled to indemnification hereunder), and (iii) the decrease in the value of any Transferred Asset or any asset of a Company to the extent that such valuation is based on any use of such asset other than its use as of the Closing Date.

TA, Definitions.  Viewing these definitions together, the Powers Parties agreed to indemnify SB&D for all "assessments, losses, damages, [and] costs" that "directly or indirectly" resulted from the inaccuracy of any representation made by the Powers Parties, other than lost profits, consequential damages, or the decrease in value of Transferred Assets due to a new use of those assets.

The Powers Parties argue that diminution of value damages are a form of "lost profits" or "consequential damages," both unavailable under the Transaction Agreement.  *See, e.g.*, Powers SJ Br. 10–13; Powers Reply Br. 5–6.  But under principles of contract law, that is not so— diminution of value instead is classified as a form of "general damages."  Such damages are not precluded by, and instead are available under, the Agreement, as damages that "directly or indirectly" resulted from the Powers Parties' inaccurate warranties and representations.

As the Second Circuit has explained, the party injured by a breach of contract may generally seek "two distinct categories of damages": (1) general or market damages, and (2) special or consequential damages.  *Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000) (citation omitted).  General damages compensate the injured party for the "value of the very performance promised."  *Id.* (citation omitted).  Under New York law, "[a] party injured by breach of contract is entitled to be placed in the position it would have occupied had the contract been fulfilled according to its terms."  *Merrill Lynch*, 500 F.3d at 185 (citing *Boyce v. Soundview*

*Tech. Grp., Inc.*, 464 F.3d 376, 384 (2d Cir. 2006)); *see also Menzel v. List*, 298 N.Y.S.2d 979, 983 (1969).  Unlike general damages, consequential damages "seek to compensate a plaintiff for *additional losses* (other than the value of the promised performance) that are incurred as a result of the defendant's breach."  *Schonfeld*, 218 F.3d at 176 (citing 3 Dan B. Dobbs, Dobbs Law of Remedies § 12.2(3) (1993)) (emphasis added).

Where, as here, "a party purchased a company on the basis of inaccurate warranties, the injured party is normally 'entitled to the benefit of its bargain, measured as the difference between the value of [company] as warranted by [sellers] and its true value at the time of the transaction.'"  *Gusmao v. GMT Group, Inc.*, 06 Civ. 5113 (GEL), 2008 WL 2980039, at *11 (S.D.N.Y. Aug. 1, 2008) (quoting *Merrill Lynch*, 500 F.3d at 185) (brackets in *Gusmao*); *see also Schonfeld*, 218 F.3d at 175–76 (measuring damages "by the difference between the contract price and the market value of the goods at the time of the breach") (citation omitted).  That is sensible, because "[g]eneral damages include those damages that are 'the natural and probable consequence of the breach.'"  *Gusmao*, 2008 WL 2980039, at *11 (quoting *Kenford Co. v. Cty. of Erie*, 73 N.Y.2d 312, 319 (1989)).  Therefore, where the seller makes misrepresentations about the business he is selling, the natural and probable result is that the business is actually worth less than the buyer paid, and diminution of value damages therefore compensate the buyer for "the value of the promised performance."  *Schonfeld*, 218 F.3d at 176.

The Transaction Agreement is in accord.  It precludes indemnification based on one particular type of diminution in value: where the buyer, SB&D, uses assets for a new purpose after the Closing.  *See* TA, Definitions (forbidding indemnification where "the decrease in the value of any Transferred Asset or any asset of a Company . . . is based on any use of such asset other than its use as of the Closing Date").  But that provision is not implicated here.  On the

contrary, SB&D's claim for indemnification is based on the inherent value of what it bought. Simply put, its claim is that, but for the Powers Parties' misrepresentations, it would have spent materially less for the Powers Business.

Finally, although the Powers Parties allude to "lost profits," they do not seriously argue that the diminution of value damages sought by SB&D are "lost profits."  Any such claim would be specious.  Diminution of value, a backward-looking measure of damages, is fundamentally different from lost profits, a forward-looking measure.[9]

Accordingly, the Court holds that diminution of value damages are available to SB&D. In light of that holding and the Court's finding of breaches by the Powers Parties of warranties and representations, it follows that SB&D was justified in withholding funds from escrow.  The quantum of such damages, and whether these damages ultimately justified withholding the full amount withheld, is to be resolved at a later stage of this case.[10]

---

[9] As the Second Circuit has illustrated the concept of lost profits:  "In the typical case, the ability of the non-breaching party to operate his business, and thereby generate profits on collateral transactions, is contingent on the performance of the primary contract.  When the breaching party does not perform, the non-breaching party's business is in some way hindered, and the profits from potential collateral exchanges are 'lost.'  Every lawyer will recall from his or her first-year contracts class the paradigmatic example of *Hadley v. Baxendale*, where Baxendale's failure to deliver a crank shaft on time caused Hadley to lose profits from the operation of his mill." *Tractebel Energy Marketing, Inc. v AEP Power Marketing, Inc.*, 487 F.3d 89, 109 (2d Cir. 2007) (citing *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145 (1854)).

[10] In light of this ruling, the Court has no occasion today to address the parties' disputes whether post-closing taxes and mitigation expenses are indemnifiable.  *Accord* Powers SJ Br. 1 n.1; SB&D SJ Br. 3.

2.  The Powers Parties breached § 3.10 of the Transaction Agreement by failing to disclose ITW's threat of patent infringement litigation;

3.  The Powers Parties' disclosures as to the Venezuelan trademark dispute were in compliance with the Transaction Agreement;

4.  As to the Powers Parties' disclosures relating to the Canadian anti-dumping duties dispute other than those arising under § 3.10, material factual disputes preclude granting summary judgment to either party, at this stage, as to the claims that the Powers Parties' representations and warranties were (or were not) breached; and

5.  SB&D has properly withheld the money in escrow at this stage, based on its claim (and the Court's finding) of breaches by the Powers Parties of warranties and representations, and because damages measured by diminution in value are recoverable under the Transaction Agreement.

Accordingly, the Court grants in part and denies in part both parties' motion for partial summary judgment.

The Court directs counsel promptly to meet and confer, and, by **October 15, 2015**, to submit a joint letter proposing next steps in this case (*e.g.*, a discovery schedule as to unresolved issues; a brief stay of proceedings to permit settlement discussions).

The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 38 and 41.

SO ORDERED.

*Paul A. Engelmayer*
_____
PAUL A. ENGELMAYER
United States District Judge

Dated:  September 28, 2015
        New York, New York