UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

JEFFREY R. POWERS, acting in his capacity as the
authorized Sellers' Representative under the Transaction
Agreement dated April 23, 2012,

                    Plaintiff/Counterclaim-Defendant,

         -v-

STANLEY BLACK & DECKER, INC.,

                  Defendant/Counterclaim-
                  Plaintiff/Third Party Plaintiff,

         -v-

JEFFREY R. POWERS, CHRISTOPHER W. POWERS,
and FREDERIC B. POWERS, III, in their individual
capacities,

                  Third Party Defendants.

------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/4/16

14 Civ. 2052 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

      This case involves claims that false representations made in connection with a corporate acquisition justified the buyer (Stanley Black & Decker, Inc., or "SB&D") in refusing to release to the seller (third-party defendant entities referred to collectively as "Powers") certain funds held in escrow. On September 28, 2015, the Court issued a decision granting in part and denying in part both parties' motions for partial summary judgment. *See* Dkt. 69, *reported at Powers v. Stanley Black & Decker, Inc.*, 137 F. Supp. 3d 358 (S.D.N.Y. 2015) ("September 28 Decision"). The Court assumes familiarity with that lengthy decision and with the facts and issues in this case.

      This decision resolves a discrete issue left open by the September 28 Decision: SB&D's claim that Powers failed to disclose that, as of the closing date of May 31, 2012, it owed some

$505,000 in anti-dumping duties for products imported to Canada in 2011. *See id.* at 377. Powers argued that liability for those duties was triggered not by its 2011 act of importing the offending products, as SB&D argued, but by the post-closing receipt of Detailed Adjustment Statements ("DAS's") from the Canadian Border Services Agency ("CBSA"). *See id.* at 378. In the September 28 Decision, the Court found SB&D's argument that liability to pay anti-dumping dues attached at the moment of importation "decidedly the more persuasive," but declined to rule on this matter of Canadian law and procedure, because certain statements by the CBSA "can be read to suggest that a duty is due only upon a subsequent determination." *Id.* at 380.

The Court suggested that the parties might wish to conduct additional discovery to enable the Court to resolve the issue. *See id.* at 381. The parties have now undertaken such discovery, briefed the issue anew, and presented argument to the Court.[1] All parties agree that the dispute is properly resolved now on summary judgment.[2]

The Court now grants summary judgment in favor of SB&D.

I.    **Background**

The relevant undisputed facts may be briefly summarized.

---

[1] On May 20, 2016, the parties submitted briefs addressing the question of when, under Canadian law, anti-dumping duties become due—upon importation, or upon receipt of a DAS. *See* Dkt. 90 ("Powers Br."); Dkt. 93 ("SB&D Br."). The parties also submitted their expert reports, expert rebuttals, and relevant exhibits. *See* Dkt. 89 ("Goldberg Decl."); Goldberg Decl., Ex. A ("Pearson Report") and Ex. G ("Pearson Reply"); SB&D Br., Ex. A ("Kent Report") and Ex. B ("Kent Reply"). On July 6, 2016, the Court held argument.

[2] The parties agree that the dispute is ripe for judicial resolution on summary judgment. Questions of foreign law are legal in nature, *see* Fed. R. Civ. P. 44.1, and "[o]nce foreign law is ascertained to the judge's satisfaction, the court should proceed to decide the summary judgment motion as it would in any other context." *See* 9A Fed. Prac. & Proc. Civ. § 2444 (3d ed.) ("Wright & Miller"); *Cent. States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1373–74 (7th Cir. 1992) (Posner, J.) (when, as here, "the record and the factfinder are the same in the summary judgment proceeding as they would be in a trial," even a "formally 'factual' dispute is properly resolved on summary judgment").

Since 2005, Canada has imposed anti-dumping duties on certain carbon steel fasteners from China and Taiwan, pursuant to the Special Import Measures Act ("SIMA"). *See* Pearson Report ¶ 8; Kent Report ¶ 13.[3] In 2010, Powers started importing similar goods into Canada. *See* Pearson Report ¶ 10. As to the 2011 shipments relevant here, Powers represented to the CBSA, upon importation, that its goods were *not* of the same description as those subject to anti-dumping duties. *See* Powers Br. 6 (citing Pearson Report ¶ 9).

In August 2011, however, the CBSA determined that 12 shipments of carbon steel fasteners that Powers had imported in 2010 *were* subject to such duties. *See Powers*, 137 F. Supp. 3d at 364. Powers then appealed this determination, and the CBSA affirmed it in March 2012, a couple of months before the Powers/SB&D deal closed. *See id.* at 364–65. In June 2012, one week after the closing, Powers appealed that decision to the Canadian International Trade Tribunal ("CITT"). *See id.* at 365. In April 2013, the CITT upheld the CBSA's ruling. *See id.*

The goods at issue here were imported in 2011—*i.e.*, after the shipments at issue in the CBSA/CITT decisions, but before the SB&D deal closed in May 2012. It is undisputed that the goods were, for all relevant purposes, indistinguishable from the 2010 imports.[4] After closing, however, the CBSA issued DAS's determining that these 2011 shipments were—like the 2010 shipments—subject to anti-dumping duties. The question is when anti-dumping duties on these goods became due—upon importation (pre-closing), as SB&D argues, or upon issuance of the DAS's (post-closing), as Powers contends.

---

[3] References to the expert reports incorporate the materials relied upon therein.

[4] Pearson, the Powers expert, assumed this to be true, and no party has ever contended otherwise. *See* Pearson Report ¶ 12.

3

## II. Applicable Legal Standards

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When the movant has properly supported its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court must "construe the evidence in the light most favorable" to the non-movant, "drawing all reasonable inferences and resolving all ambiguities in their favor." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 118 (2d Cir. 2013) (quoting *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 151 (2d Cir. 2012)).

## III. Discussion

It is undisputed that Canadian anti-dumping duties were eventually due here on the goods that Powers imported in 2011: The CBSA so held in its post-closing DAS's. The question here is when Powers became liable to pay such duties. Was Powers' liability triggered by the act of importation, *i.e.*, when they were brought across the border? Or was its liability triggered only

later, when the CBSA determined that the goods were subject to anti-dumping duties? The Court has benefitted from the parties' expert reports, which have helped explain and put in context the relevant provisions of Canadian law.

The Court has previously expressed skepticism of Powers' view—that an importer becomes liable to pay anti-dumping duties for bringing covered goods across the Canadian border only if and when it receives a DAS. *See Powers*, 137 F. Supp. 3d at 380. That view is counterintuitive, to say the least. By Powers' logic, the Court noted, "an importer that does not pay a duty upon importation and goes uncaught never owed such a duty in the first place, even if application of the governing standards to the facts dictated that a duty was due." *Id.* On such reasoning, the Court continued, "a United States taxpayer who declined to pay federal income taxes for a given tax year did not owe such taxes on April 15 of the following year, but rather, only when the Internal Revenue Service came after him and assessed him for unpaid taxes." *Id.* at 380 n.5. In the United States, the Court noted, that view "is assuredly not correct." *Id.*

The Canadian legal and regulatory materials to which the parties have now drawn the Court's attention have confirmed the Court's common-sense intuition. An importer that brings goods subject to anti-dumping duties across the border is liable more or less immediately for such duties. The pertinent statute, SIMA, states that anti-dumping duties "shall be levied, collected and paid on all dumped and subsidized goods imported into Canada in respect of which the [CITT] has made an order or finding, before the release of the goods, that the dumping or subsidizing of goods of the same description has caused injury or retardation." SIMA § 3(1). The CBSA's regulatory guidance states that the importer "becomes *immediately* liable for

payment of antidumping and/or countervailing duties upon the importation of goods subject to such duty." See Kent Report, Ex. D ("Memo D14-1-7"), ¶ 30 (emphasis added).[5]

To be sure, the date on which payment must be made may fall later, depending on whether an obligation to pay duties is contested. According to Powers' expert, Pearson, duties owed must be paid by the time of "final accounting."[6] See Pearson Report ¶ 3. The date of final accounting in turn triggers a 30-day period in which the CBSA has an opportunity to make a "final and conclusive" determination of whether the goods are subject to anti-dumping duties. SIMA § 56(1). After 30 days, if the CBSA has not by then acted, the representations made by the importer are "deemed" accurate. Id. § 56(2). The CBSA may, however, revisit and revise its initial determinations for up to two years. Id. § 57(b).

The fact, however, that the CBSA serves to review—and may accept or reject—the importer's representations does not mean that liability to pay anti-dumping duties for goods found to be subject did not attach upon importation. Various other provisions of Canadian law eliminate the possibility that liability for such duties attaches only upon an affirmative CBSA finding. First, and significantly, both parties' experts agree that, when the CBSA determines that

---

[5] This CBSA policy memorandum was adopted in October 2015, superseding Memorandum D14-1-6, which contained substantially identical guidance. See Pearson Report ¶ 26 ("The importer becomes immediately liable for payment of provisional duty, anti-dumping duty, or countervailing duty upon the importation of goods subject to such duty." (quoting Memo D14-1-6, ¶ 8)).

[6] Pearson does not specify the relationship between the final accounting date and the date when the goods at issue reach Canadian customs, e.g., whether, as appears to be the case, the final accounting date is deferred while the CBSA reviews the documentation of an importer like Powers which has declared that anti-dumping duties are not due. But Pearson acknowledges that Powers had an obligation to account for the goods and pay duties on the goods by the prescribed final accounting date, see Powers Report ¶ 3; id. ¶ 23 ("Duties owing must be paid at the time of final accounting."), and that this date was prior to or just after the release of the goods into the market, see id. ¶ 3. In any event, there is no dispute that the final accounting date for all relevant shipments occurred well before the SB&D deal closed.

6

duties should have been assessed upon importation, the importer must pay, in addition to the duties themselves, interest accruing *from the time of importation/accounting*. *See* Kent Report ¶ 16; Pearson Report ¶ 40. The retroactive assessment of interest is at odds with the notion that the anti-dumping duties were not due until the DAS was issued. Indeed, the relevant provision expressly equates the date of final accounting with the date on which "the person *became liable* to pay the amount." *See* Customs Act[7] ¶ 33.4 (emphasis added); Memo D14-1-7, ¶ 44 (same). Thus, even in the context of *post hoc* re-determinations, Canadian law provides that the importer "*became liable*"—past tense—long before the DAS. In other words, the anti-dumping duties were due upon importation, and in any event well before the SB&D/Powers deal closed.[8]

Further support for this conclusion is provided by the SB&D expert's correspondence with officials at the CBSA.[9] *See* Kent Reply, Ex. A ("CBSA Correspondence"). The expert, Kent, emailed a set of propositions to personnel in the CBSA's Programs Branch, seeking to "confirm CBSA interpretation and policy." *Id.* at 2. The officials "reviewed" these propositions and "confirm[ed] that they reflect CBSA's interpretation and current policy." *Id.* at 1. Most

---

[7] The full statute is available at http://laws-lois.justice.gc.ca/eng/acts/C-52.6.

[8] Even if Powers *were* correct that the duties became due only upon receipt of the DAS's, it would not necessarily be off the hook. For if Powers had disclosed the ongoing 2010 litigation—which it failed to do, in breach of the transaction agreement, *see Powers*, 137 F. Supp. 3d at 377—SB&D likely would have inquired about similar post-2010 imports. This inquiry may well have revealed the 2011 imports and the probability that—unless Powers prevailed in its final appeal to the CITT—similar duties would eventually be owed. SB&D would thus have a colorable argument that Powers' failure to disclose the 2010 litigation caused it to suffer the same diminution-in-value damages that would otherwise be established if—as the Court finds here—Powers, as of the closing date, had a duty to report as a liability the anti-dumping duties due as a result of the 2011 imports.

[9] Powers objects to the Court's consideration of this material, but the Powers expert sought in similar fashion to buttress his conclusions by consulting with the CBSA, albeit to considerably less persuasive effect. *See* Pearson Report n.34 & n.36; *see also* Wright & Miller § 2444 ("In addition to primary materials and expert testimony, a litigant may present any other information concerning foreign law that is believed to further his or her cause.").

relevant here, they confirmed that "[i]f the information underlying a ['deemed'] determination is incorrect and duties are in fact payable, liability will exist, *and will have always existed*, as of the date of release of the goods from customs upon importation."[10]  *Id.* at 3 (emphasis added).

Powers makes several counter-arguments. None is persuasive.

*First*: Powers seeks to draw a distinction between the *in rem* liability of the goods and the *in personam* liability of the importer, the latter of which, it contends, arises later than the former. "[T]he importer's personal liability . . . to pay interest retroactively," Powers argues, "is contingent on and corollary to the *in rem* liability of the goods themselves." Powers Br. 19. In other words, duties and interest are charged against the goods (*in rem*) upon their importation, but, Powers claims, the importer's "*in personam*" liability is "separate and distinct," and "arises at various points in time, which may or may not be 'at' importation." *Id.* at 4. But the *in rem* versus *in personam* distinction for which Powers advocates has no textual basis in any relevant legal authority to which the Court has been pointed. And Powers' notion that personal liability to pay duties associated with dumped goods may arise after the goods incur *in rem* liability is hard to square with Memo D14-1-7, which provides the importer immediately becomes liable upon importation of dumped goods.

*Second*: Powers similarly attempts to distinguish between "levying, collection and payment," noting that while duties are "levied" at importation, they are sometimes "collected"

---

[10] Powers objects that this reference to "liability" is vague and may not refer to the importer's *personal* liability. *See* Powers Br. 17–18. But the surrounding context makes clear that Kent was asking the CBSA officials about that subject. *See* CBSA Correspondence at 2 ("[A]n importer becomes personally liable to pay antidumping duties at the time of importation."); *id.* at 2–3 ("The fact that a determination has been made under section 56 of SIMA that imported goods are not 'of the same description' as goods covered by a CITT finding (and hence no antidumping duty is payable) does not absolve the importer of the personal liability flowing from section 3 of SIMA if the information upon which the section 56 determination has been based is incorrect (whether or not the erroneous information was provided by the importer in good faith or bad faith) and imported goods are in fact goods covered by an antidumping finding.").

8

and/or "paid" later. *See* Powers Br. 15 (citing Pearson Report ¶¶ 24–25). But the fact that a duty to make a payment may post-date the levying of that obligation does not mean that the importer is not liable for it. A U.S. taxpayer who has under-withheld income tax payments for a given calendar year is nonetheless liable, as of December 31 of that year, for future tax payments, even though these may not be due until the following April 15. And, as Pearson acknowledges, the CBSA "uses the word 'liability' to refer collectively to the processes of duty levy, payment and collection," *see* Pearson Report ¶ 26, and states unequivocally that an importer "becomes immediately liable for payment of [anti-dumping] duties upon the importation of goods subject to such duty." Memo D14-1-7, ¶ 30.

*Third*: Powers states it took the position in "good faith" that its goods were not subject to anti-dumping duties and pursued that unsuccessful position on appeal to the CBSA and CITT. *See* Powers Br. 8–9, 16. But nothing in the relevant Canadian legal texts makes an importer's obligation to pay anti-dumping duties dependent on its state of mind (*i.e.*, its good or bad faith).[11]

*Fourth*: Powers argues that the "deemed determination" that occurs if the CBSA does not act promptly "is a final decision that is equivalent to a determination [by the CBSA] at the time of entry," reasoning that if the importer's representation that its goods are not subject to anti-dumping duties is "deemed" accurate, it cannot owe such duties until a subsequent

---

[11] Even if subjective good faith were relevant, Powers' good faith in representing to Canadian customs authorities that the 2011 goods were not subject to anti-dumping duties does not appear to have been a subject of discovery; on the present record, the Court cannot assume that Powers would meet such a standard. Powers' treatment of the 2010 and 2011 imports vis-à-vis SB&D certainly appears to have reflected less than complete transparency. Powers appealed the CBSA's adverse ruling as to the 2010 imports in a manner that obscured from SB&D the fact of that adverse ruling. Powers waited until one week after closing to file its appeal to the CITT, apparently in the view—which Powers unsuccessfully pressed to this Court in the first round of summary judgment litigation—that doing so permitted it not to disclose, as pending litigation, its dispute with Canadian trade authorities. As a result, as of closing, Powers—but not SB&D—knew that (1) the CBSA had held that the 2010 shipments were subject to anti-dumping duties, and (2) there were identical shipments from 2011 whose treatment would be controlled by the outcome of its imminent appeal to the CITT as to the 2010 shipments.

determination is made. Powers Br. 6 (quoting Pearson Reply ¶ 5). But the CBSA takes the view that liability arises at the time of importation *even if* an importer mistakenly declares goods as not subject to anti-dumping duties. *See* CBSA Correspondence at 2–3. An importer is required to provide information at the border that is "true, accurate and complete." Customs Act § 7.1. The importer's inaccurate claim that duties were not due does not alter its legal obligations.

*Finally*: Powers challenges SB&D's expert report, by Christopher Kent, as unreliable and inadmissible under Federal Rule of Evidence 702. According to Powers, the Kent Report did not "cite sufficient authority to substantiate his positions," and was, therefore, mere *ipse dixit*. Powers Br. 11. The Court is unpersuaded. While the Pearson Report is longer, Kent's is more persuasive, as the common materials on which both experts rely (the plain language of the SIMA and Customs Act, and the CBSA's instructive memoranda) favor SB&D's position on the question at hand. Whatever the force of Powers' critique, it does not support disregarding Kent's reports. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to the strength of [the expert's] credentials, faults in his use of [a] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony.")

## CONCLUSION

For these reasons, the Court holds, with SB&D, that the anti-dumping duties at issue became "due" before the SB&D/Powers deal closed. The Court grants partial summary judgment on that point in favor of SB&D.

Discovery is presently stayed. *See* Dkt. 86. The Court directs the parties to submit a joint letter within two weeks identifying open issues (if any) in this case and setting forth their view(s) on appropriate next steps. The Court further directs counsel to meet and confer within one week of today to explore the possibility of resolving this action.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: August 4, 2016
       New York, New York